Good morning and welcome to day two of our sitting here in Jacksonville. Judge Luck and I are thrilled this morning to have with us Judge David Leibowitz, who is a judge on the Southern District of Florida. He is a two-time graduate of the University of Pennsylvania and the London School of Economics. The guy is, he's the real deal, so don't mess around. And he was a prosecutor in the Southern District of New York, among other places, that currently resides in the great state of Florida. And so, I'm thrilled to have him with us. We thank you for helping us with the work. Judge Leibowitz Thank you, Judge. Judge Luck And so, just a couple of rules of the road. Number one, and most importantly, please know that we have read your stuff. We've read the briefs and the cases you've cited to us, the statutes, the record materials, whatever. So, you've got limited time before us. Don't waste it with a bunch of factual and procedural ramp up. Just get right to the core of the issue that you think ought to drive a decision in your favor. We'll have some questions for you along the way. Two, the traffic light system, green is go, yellow is slow, red is stop. As I said yesterday, I'm not great about stopping people in the middle of a syllable. And so, when you see the red light, just please do begin to wrap up. And if you see my body language, my head bobbing, my tongue in the side of my cheek, you'll know that you've overstayed. So, with that, let's call the first case, 24-12481, United States v. Flores. Mrs. Fussell, is that how you pronounce it?  Yes, Your Honor. Okay, very well. Here for the appellant, and Ms. Adams here for the appellee. Ms. Fussell, you have reserved five minutes for rebuttal. Proceed whenever you're ready. Thank you, Your Honor. Good morning, Your Honors, and may it please the Court. When Mr. Flores sought substance use disorder treatment, he reasonably expected that his treatment records would remain private. That expectation was supported by a federal statute forbidding the very disclosure and law enforcement use that occurred here. When law enforcement searched those private records without a warrant, they violated the Fourth Amendment. They then used the fruits of their initial illegal search to identify Mr. Flores in the videos of him obtaining treatment and to connect him to the robberies. Deterrence of that kind of conduct is what the exclusionary rule aims to achieve. Can I ask you just a quick question? Are we talking about the security camera footage and the sign-in sheet, or one or the other? Because the district court's decision really addresses the security camera footage, but I don't really see that it addresses the sign-in sheet. Your Honor, that's correct. The district court deliberately declined to address the reasonable expectation of privacy in the sign-in sheet records. And our position is that that's reason enough to remand, because that initial search of the sign-in records indisputably led to the search of the surveillance videos. So without the sign-in records, the surveillance videos would have been essentially useless. They would have had no way to determine that the man in the green jacket or the man in the white jacket in the videos was Mr. Flores. The treatment records were what informed that and enabled them to conclude that. When you're referring to treatment records, are you and I talking about the same thing, the sign-in sheet? I'm calling it the sign-in sheet. You're calling it a treatment record? Yes, Your Honor. So it's not a typical sign-in sheet that you would expect to see at a regular doctor's office where everyone signs in for their appointments. Rather, it's where the patient signs to confirm that they've received the methadone dose. So it's not an arrival record. It is a treatment record in that it provides the information of the dosage and when the dose was received. But it's also not a typical medical treatment file in the sense that it's, I assume it's like out on the counter for everyone to see. No, Your Honor. These records would be behind locked doors. They're not on the counter for anyone to see at all. In fact, if the treatment center were to have it out on the counter, they would be violating the law because revealing the identity of a patient of substance use disorder treatment is illegal under 290DD2. Does the district court make a finding that these, I think it's helpful to analyze these things separately, so that the video and the sign-in sheet were voluntarily provided by the treatment center to law enforcement? Your Honor, the district court did allude to that without fully engaging in a private party search doctrine analysis. Didn't the magistrate judge specifically make a finding that those things were voluntarily provided? Yes, Your Honor. As far as I understand it, the objections were not, no objection was made to a factual finding, correct? Your Honor, there were objections made to factual findings. For example... The district court was wrong when it said, no one has disputed the facts here. That was wrong when the district court said that, right? Your Honor, the district court actually, actually resolved one of the objections and resolved the objection in favor of the defendant. Here's what Docket Entry 113 says, it's the endorsed order from the magistrate's R&R quote. The court took briefing from counsel as well as cogent oral argument. Movent Flores notes he does not disagree with the factual findings of the report and recommendation, save for one Scrivener's error. And then it adopts the R&R. Is that right? Your Honor, yes, if the Scrivener's error was the factual objection that the defendant made below, it's not really... Irrelevant here, right? Correct, Your Honor. So we agree that there was no objections to the factual findings made by the magistrate judge, right? Yes, Your Honor. And one of those factual findings was, not the legal implications of it, but the factual finding was that these things were voluntarily provided by the medical, I'll call it the clinic or the medical provider, to law enforcement, correct? Correct, Your Honor. So given that factual finding and given that it's not contested here, how can we say that the voluntarily provided doctrine does not apply, even if there was a statute, even if it needed a warrant? Why when those things were voluntarily provided, is that not sufficient and not a public search that would require a warrant by law enforcement? Yes, Your Honor, and it's because it's not sufficient under the private party search doctrine for the district court to just conclude as a factual matter that it was voluntarily provided. Well, those are different things. What historically happened is different than the legal conclusion from that, but what historically happened was that law enforcement went in, and these folks, this clinic has a policy that if there is some criminal activity that is connected to the clinic, the clinic will allow sort of a sneak peek, it won't provide it, but it allow them to look at the video and to look at the sign-in sheet. That's the policy. Respectfully, Your Honor, the policy is that if a crime is committed on the premises, that they are, that they can permissibly show them. The problem is though, let's assume you're right, I don't think you are, but let's assume you're right for the moment on that, because I'll explore in a second why you're not, but let's assume you're right. If there's no objection to the factual finding, how can we review what you've just said, even assuming you're right? Because there wasn't objected to, and so we have to take that factual finding as a given, and once we take that as a given, how is the legal conclusion that flows from that factual finding, not that this was not a Fourth Amendment search? Because Your Honor, under the private party search doctrine, number one, it's the government's burden to establish that, and it didn't even raise the private party search doctrine below, but also the only question under that analysis isn't whether it was voluntarily provided. So I think what the district court meant here is that they weren't compelled to provide it at that precise moment, but did they provide it of their own volition, unprompted by law enforcement as the private party search doctrine would require? Absolutely not. They refused to provide it until they were given a subpoena. Provide, but the problem is you're sort of changing the word here, it's not provide, it is, as I understand it, law enforcement came in and they said, law enforcement told them why we're here, and they said, we have a policy which where a crime is committed on the premises, that is, somebody was picked up here in order to be able to commit a robbery, we're going to let you do a sneak peek here. Now whether they misapplied their policy or not, whether they didn't, whether they should have or shouldn't have or not, whether there's a law that prohibited them from doing what they did or not, that is in fact what happened. So again, how does the conclusion flow that this was not a public search but a private one? Yes, Your Honor, and that's because it requires that they do it entirely of their own volition. So as soon as law enforcement goes there with a subpoena and says, we want to see your records, the private party search doctrine cannot apply at that point. But the subpoena was them, they said, yeah, we'll show it to you, just come bring us a subpoena. And what the district court found is not that the subpoena compelled it, but that they would have allowed them to look at it under this policy. Your Honor, even if their policy permitted them to do it, it's still, or whether their policy permitted them to do it or did not permit them to do it, it doesn't matter under the private party search doctrine analysis. The private party search doctrine is very clear that it has to be of their own volition. If for example, law enforcement went there and said, listen, we're investigating a string of robberies. We think that the guy who, the suspect may have been here. And then of their own volition, they go and look at their records and decide that they're going to provide the law enforcement with that. That's permissible under the private party search doctrine. That's not what happened here. Law enforcement went and demanded access to these records. They were told no. They came back with a subpoena. They were still told that they couldn't take them away. And then while they weren't provided with them in a tangible sense, they were absolutely provided with access to the records. And at that point, it's government conduct, not the private party's conduct, that's responsible for the search. Which is likely the reason the government did not even attempt to argue the private party search doctrine below, even though the defense put it on notice by initially mentioning it in the motion to suppress. How is there a reasonable expectation of privacy in the videos? Your Honor, because these are the videos of Mr. Flores seeking and obtaining substance use disorder treatment. This is one of the most... Is there, if you went to CVS and walked into CVS and walked to the sort of back area where they do the medical part, and asked the pharmacist for some medical advice, and got a prescription for something that was very private, for example, like I need some medicine for substance abuse treatment. Would we not be able to subpoena or to look at, and would one have a reasonable expectation of privacy in the videos from the CVS? Your Honor, I think it's questionable whether you would be able to. I think under HIPAA that a non-grand jury subpoena like the one they had here would not be enough. But I think absolutely... How is a video a HIPAA document? Explain to me how it's a medical record. So Your Honor, I don't want to get too far into HIPAA here, but I'll tell you that under 290DD2, it's clearly a substance use treatment disorder record here, because it identifies a patient as seeking or obtaining substance use disorder treatment. The statute is very clear. How does it identify the patient? Because it's a visual representation of his identity. How is a parking lot video a representation of someone seeking treatment? How is somebody in the lobby of a medical clinic someone seeking treatment for a specific substance abuse? I'm having trouble making that connection. Because it identifies him as seeking substance use disorder treatment, and the law is very simple in that it reaches all of those things. So that's why the clinic has frosted glass. That's why they have a very secretive sign-in procedure, because if they didn't, they would run afoul of 290DD2.  Very well. I see that your opening time is up, but you've got some rebuttal time remaining. Ms. Adams, let's hear from you, 15 minutes. May it please the Court, Anne O'Connell Adams for the United States. The district court correctly denied Flores' motion to suppress the new season surveillance videos in this case. Flores' primary contention is that Agent Camp's acquisition of the videos was tainted by a prior warrantless viewing of the sign-in sheet and the surveillance videos by the Tampa police. But those actions didn't violate the Fourth Amendment. Flores wants this court to recognize a categorical exception for medical records under the Fourth Amendment. But no such exception exists, and even if this court were inclined to create one, the documents in this case shouldn't fall into it. Counsel, in your brief, you state that the statute doesn't have a suppression remedy. That's incorrect, right? The statute has a suppression remedy. No, we think that's incorrect. I think the remedy is laid out in subsection F, that's the penalties provision that cross-references the HIPAA penalties. Subsection C is not a suppression remedy. What it says is that before you can introduce the evidence in court, you need a disclosure order in place. And we had a disclosure order in place before the evidence was introduced. And the statute defines a record as any information in connection with a substance abuse treatment diagnosis, identification, right? Records broadly defined by the statute. That's right. So, before you got the 2.65 order, there was a violation of the statute. Forget the Fourth Amendment. There was a violation of the statute prompted by the voluntary provision of that employee, and that violation is suppressible under the statute, correct? No, I don't think so. Why? I mean, that violation may be, but we got the disclosure order in place before the evidence was introduced at trial. And I don't think that there's like a fruit of the poisonous tree thing built into the statute. I agree with you on the 2.65 order, that that probably cleanses the taint, but just so that it's clear. They only brought a Fourth Amendment challenge. They didn't bring a statutory challenge. But before you got the 2.65 order, everything that happened before was a violation of the statute, and the statute under C suppresses that, right? Yes, I wouldn't necessarily say everything because there's different things here. There's surveillance videos, some of which are not, I don't think, fall under the statute because they don't necessarily identify Mr. Flores as a patient at the clinics. Those are the ones in the parking lot and the lobby. There are other surveillance videos that do identify him as a patient because he's back behind at the treatment windows taking pills. For the distinction between a video and a sign-in record, much of the video you would concede is defined as a record under the statute before you got the 2.65 order. Not all of it, but a lot of it, right? I think that's right. So the distinction below about video versus sign-in versus treatment records, before you get the 2.65 order, that's all suppressible, right? Now they didn't bring that because you got a 2.65 order. That's right. Under Noriega, tell me why the 2.65 order cleanses everything that happened before. Under Noriega, it's because we didn't ... Under Noriega, you first excise the information that was in the application for the disclosure order. So the disclosure order application in this case went through the whole of the investigation. It described the robberies, how they found Michael Field, what Michael Field said, how they identified who Flores was before anybody ever even went to New Season. So if you excised the ... There were two paragraphs at the end that did say, and the Tampa police went there earlier and this is what we found. That was actually like a privacy protective disclosure because if you look at the subpoena that the Tampa police first got, they were looking for a larger date range for all of the videos from 5.30 in the morning until 2 o'clock in the afternoon. It would have been a little bit odd to exclude the information about the prior visits here because it helped the court to narrow down that they just needed two specific dates. Are you from Noriega, outside of the warrant context? I don't think so, but it's ... It's the Supreme Court. No, I don't think so. But it's the same basic test as the good faith doctrine as well. And this is the McGuff case that we cited. So I think under McGuff, this case definitely falls under the good faith exception for the same reason. Because the prior visits, even if they violated the Fourth Amendment, we didn't need that information in order to obtain the disclosure order. The reporting process says you can't use ... You can't sort of bootstrap an illegal search to then get process and then say we relied on that process. That you have to have good faith from the initial intrusion, not from the process. What do you make of that point, that argument? I think that's wrong. I think that the court's decision in McGuff is kind of the analysis that takes you through that good faith. That even if the prior visit violated the Fourth Amendment, if the information discovered during that visit didn't lead to the application for the disclosure order, then you can still rely on good faith. Most of the applications of good faith, though, have to do with some sort of mistake of fact or law. Like, we got this kind of order, but now we're required to have a warrant. Like in the carpenter context, for example. Or we had a warrant, but the warrant was no good. That's herring. And so we thought we had a legitimate warrant, but in reality, it was not. Where have we applied good faith in the context of where there was illegality that led to us getting the warrant, and then we got a warrant based on that illegality, and now we're relying on that warrant? Well, McGuff is the case that we've relied on in our brief, and it does include a prior warrantless entry. So in that case, the police entered a home without a warrant to get the little girl's shoes that they were going to take away when arresting her father, and they saw a gun and then applied for a warrant based on the gun that they saw. They otherwise wouldn't have had probable cause. And the test that the court applied said because it was that gun that led the police to apply for the warrant, then they couldn't rely on the good faith doctrine. So let's assume that that's right, and let's assume that you could apply good faith in that matter, and let's assume we do so. I understand the point about Flores, and Flores leads you to the Robbery 3, which then connects because it's the same card of Robbery 2. Your opposing counsel, though, makes the point in brief that that doesn't really help you with regard to Robbery 1, because the only way you learn about Robbery 1 was when you looked at the sheet of paper, saw that he had been there on the 13th, and then went back and connected it to the robbery, and then sought the subpoena for the video for that day, and led to Kwaki and all the other stuff that came from it. I don't think that's quite right. The sign-in sheet showing that he was there on the 13th wasn't the only thing that led them to Cowie. I don't think it was the thing that led them to him. At the time that you applied for the order, it may have been, was it not? No. I think the police had identified, I can check my timeline, they didn't interview Cowie until later. Yes. But I think they, I think the court had already, I think Agent Camp had already identified him from the video before they applied for the order. I thought it was not until much later that they, I guess, defuzzed the video that they were able to find the license plate. That didn't happen until far later in the investigation, right? My timeline that I have here, which is taken from my brief, so the sites will be there, but May 3rd is when, of 2022, is when Agent Camp read the license plate on the blue Camry, and he may have done it earlier than that, but that's the first time that it's included in a report, so May 3rd, and it was May 12th that the United States applied for the court order. And Cowie, you know, they found him, he was on the video, he was on the surveillance video of the February 13th robbery. He goes in. But they hadn't interviewed him yet, and that, was that in the Warren application? Because they wouldn't have interviewed him, that came after the Warren application, or the application for the 256 order. That's right. And so, how can we excise that and still find the probable cause for the February 13th information that was sought? I think it's because they, well, you're right, I guess they knew that from the drug treatment records. But I think that by the time they applied for, by the time they introduced the evidence at trial, they definitely had that information from all kinds of independent sources, including Michael Field and Cowie. I can briefly address the private search doctrine, just to state our position on that. You should. Okay, we didn't rely on that, because when we looked into the doctrine, the language is always what a private party freely shares with the government. And in this case, I think the timeline is that the Tampa police first went there and said, can we see the records? And they said, no, come back with a subpoena. And then it was when they came back the next day with a subpoena that they got that sneak peek, but didn't actually get the videos. I don't understand that, counsel, because we see this all the time. Title III, a wiretap, requires probable cause plus necessity, is probably the highest standard to get a wiretap. If someone inside the phone company says, you know, I just saw something on my screen, I don't think I'm allowed to do it, come back with a subpoena, and I'll let you look. Why isn't that freely given? It's freely given in the sense that a private actor is doing something of their own accord, which is less than the standard required by law. Isn't that exactly what happened here? That is what happened here. But they did require, the new season wasn't going to show them anything at all until they came back with some kind of a compulsory process. So I think it is hard to square that with the... That's not true. I mean, that's not true based on the evidence and based on the findings of the district or the magistrate general, right? That may be right. I mean, I... I'm asking you if it's right. Yeah. Is that your position that that's not right? I... Read the testimony, and this is, let me be clear what exactly what we're talking about, and your opposing counsel referred to it when she was up here earlier, but this is docket entry 78, which is the transcript of the hearing at pages 106 and 107, and this is the corporate rep for the clinic testifying about why it was turned over, and he says it was turned over based on a policy we had, which is our understanding, that where there's a crime that's connected to, he uses on the premises, where it's on the premises, there's a crime connected to it, we will let law enforcement look at it, but we won't hand over the document, and he was asked, did you turn it over based on that policy? My understanding is that it was... That is the policy, and it was turned over based on that policy. The magistrate judge then found that that was voluntarily turned over under that policy. What... What am I missing? I think the reason that we didn't go down that route, and we certainly didn't raise it in the district court, nor did we raise it in our brief here, is because of that initial turning away of the Tampa police when they came to get the surveillance videos, and saying you need to come back with a subpoena. Once they make a Fourth Amendment challenge, to broaden Judge Luck's question, once they finally make a motion to suppress under the Fourth Amendment, is it your position that private search is preserved in any way in this record, or no? No, I don't think so. We didn't... We haven't made the argument, so I'm not going to try to rely on private search here. What we're relying on is the third-party doctrine, and under the Supreme Court's third-party doctrine cases, both the sign-in record and the surveillance videos were included information that was disclosed to third parties. I'm with you on the videos, but you're going to have to explain to me how a medical record, one that is otherwise private, that has specific treatment options, would be one that society does not reasonably expect would be private. In other words, when I go to the doctor, and the doctor keeps records, and put those records in whatever files they have back there, it's all electronic now anyway. I do not expect that to be private, even though it's between me and my doctor, and whatever staff that the doctor has. Especially when the United States Congress has passed a statute that has a good cause standard with suppression. Why isn't Judge Luck right? I think there are two relevant statutes that talk about the privacy of medical records. One is the one that's squarely at issue here, that, as you say, has a good cause standard. It's not a probable cause standard. It doesn't require a warrant. And the other one is HIPAA, and under HIPAA, there's this law enforcement exception that allows the disclosure of protected health information based on a subpoena. The regulation here also assumes that the government is going to get a subpoena once it has the disclosure order in place. So none of those things are creating like a... I don't... The statutes are not dispositive. The question under the Fourth Amendment is, is this an expectation of privacy that society deems reasonable? And it would seem to me that, like cell phone records, like the things that are sort of most intimate and private, one would expect our private medical records, especially for something as sensitive as drug treatment, to be private. How is that... Just because a third party happens to hold those, by necessity, would have to hold those. How is that... How does that sort of vitiate the expectation? There may become a point, like in Carpenter, where the information that the governor is seeking through somebody's medical records discloses enough private information that a warrant should be required. But the information that was obtained in this case comes nowhere close to that. In Carpenter, it wasn't just one single movement. It was four months' worth of cell site location... That I am a drug addict and that I am seeking methadone as treatment for that is not sensitive or private? It is sensitive and private. It's not the whole of somebody's story that the... Of course not, but that is the record we're talking about. It has that information on there. I mean, yes, you're right, theoretically, like my name and address and maybe that I have insurance is not, but this would seem to be, would it not? I don't think so. In this case, it was surveillance videos and it was the sign-in sheet. The sign-in sheet does have a dose of methadone listed on it, but it's otherwise just a tracking record that anybody at New Season could have been keeping track of what time they were there and the surveillance videos were just disclosing what he was wearing on that day. But you agree with respect to the sign-in sheet that it's not out on the counter? It's behind the counter, behind locked doors? Do you agree with that? I think that's right. We're not entirely sure. There is a sign-in sheet type thing in the record. It's at docket 126, page 8. This is what we eventually got with a second disclosure order in place, but was never introduced at trial and it looks like a little electronic record that you would pull up on a screen. All we know about what the officer looked at was in the suppression hearing, he says they pulled up his record and showed him that he was there on the 13th and 19th and 25th. The police officer does say at the suppression hearing that it showed a dose of methadone as well, and the time he was there. It seems to me that there is at least one important fact that the sign-in sheet reveals that the security footage cannot, namely the dosage, is that correct? That's correct. You can't see the dosage from the security camera? That's correct. You might see that he approaches the counter, takes a pill, but that's all you know? Yes. So there is a fact about the dosage that can be revealed only by the sign-in sheet? That's right. It's one fact. It's a tiny snippet of information that doesn't come close to the one case, Carpenter, where the Supreme Court has recognized that a person can have a reasonable expectation of privacy in records held by a third party. But I guess to me, Carpenter in this case seems sort of orthogonal to one another because in Carpenter, one's physical location in the world is something that he or she is projecting to the world. And Carpenter says, yeah, yeah, but these cell site location records are just so pervasive and so comprehensive that we're going to kind of like ignore the fact that the person has disclosed his location to the world by walking around in it. This is different. Right? I mean, like, he never sort of put his dosage of methadone out there in the real world. Right? That's right. But I think that just under the third party doctrine, unless there's just a categorical exception for any single medical record, even one single fact in a medical record, that would require the United States to get a warrant instead of a subpoena before getting that information, which none of the relevant statutes and regulations envision, then it's not a Fourth Amendment search to get that piece of information. Can I ask you one more, just kind of blocking and tackling question, first question I asked your adversary. What do we do with the fact that, as I read the district court's order, it doesn't even address the sign? I think that, you're right. It doesn't address the sign and sheet. It says we don't need to address it because we're only talking about the suppression of surveillance videos. But later in the magistrate judge's opinion, under the independent source doctrine portion, it does say, it discusses the fact that the Tampa police went there earlier and looked at these records and says, we don't need to decide if that was a search because independent source doctrine, then it goes through the rest of its Fourth Amendment analysis. But I don't think that's any reason why the case needs to be remanded because I think the analysis is essentially the same for the two. The sign and sheet is slightly different, but the videos, at least one of the videos, shows Flores receiving treatment, taking the pills at the dispensation window. And so I don't think that the analysis should be any different. Thank you. Thank you very much. Ms. Fussell, you've got five minutes remaining. At the center of this case is the reasonable expectation of privacy in substance use disorder treatment records. Can we start by talking about harmlessness? I actually think we do need to, because of how this was litigated, split up the difference between the videos and the sign and sheet. Why is the sign and sheet not completely harmless? It wasn't admitted. They learned about February 13th through the videos. I just don't understand why anything that happened is not harmless with regard to the sign and sheet. Well, Your Honor, first, the government bears the burden on harmlessness. So that means here that the government has to show that there's no reasonable possibility that the new season treatment records or their fruits might have contributed to Mr. Flores' convictions. Right. So here, in terms of, if Your Honor's referring to the treatment- Here's what I'm referring to. The first statement out of the mouth of the person who prosecuted this case was, we admit that he robbed these three gasoline stations, or these three conveyances, or places of business, but the gun's not real. And the jury believed you completely. At that point, you really don't need much evidence to show that whatever would have been suppressed or not suppressed is harmless. Your Honor, that's correct. Defense counsel did make clear on the record that they would have gone a different way. That's not the harmless error test. You're right. But that's not the harmless error test. The harmless error test is what you just said to begin with, which is that without the evidence and its fruits, it would not have led to conviction. That has nothing to do with the strategic decision of counsel. By the way, a very good and wise one. I don't want to critique it at all. I understand exactly why counsel did what he or she did. But by doing that, I don't think we could say that it had any effect on the verdict where the jury was told from the first second of trial, he is guilty of the three things in which the jury found him guilty from the defendant himself, plus all the other evidence that was not poisoned by whatever fruit would have been from that one little fact from that one piece of paper. So, Your Honor, the harmless error analysis necessarily looks at a hypothetical scenario wherein the evidence was suppressed. If we ask that question, what would have been different if the evidence was suppressed? Well, defense counsel never would have taken that position. We have no... I mean, that is not in the record at all. What they said is, we are stipulating based on prior rulings or based on that. But it was not, we wouldn't do this but for that. But even so, the test is, without that evidence, would the jury have reached a different result? Would he have been convicted? And the answer is, under that hypothetical, we would have had everything other than was tainted by that evidence. And we can't say that counsel's stipulation is tainted by, is the fruit of a poisonous tree. I've never seen anything like that. It wouldn't make sense to treat it that way. Counsel made a strategic call. And by the way, it wasn't the only call that they could have made. This could have been a plea with a reservation. This could have been a stipulated bench trial. They could have done this any number of ways. But counsel chose to roll the dice at trial, I get why. And roll the dice at sentencing. But there's consequences to that decision. And that consequence is, how can we possibly say that even if I agreed with you with regard to the sheet of paper, that that's not harmless? Your Honor, even if, so, even if we say, well, counsel made this stipulation and counsel moved forward with this strategic decision, and that decision has consequences, I would maintain here that there's still no way that the government can show that there's no reasonable possibility that the videos contributed to the verdict. Otherwise, they wouldn't have bothered to do it. The videos, again, I'm not, my hypothetical, I'm not saying you're agreeing to this, is I don't agree. I think that there's either a voluntariness or reasonable expectation of privacy or something with regard to the videos. We're only talking about the sheet of paper. What, how could that be harmless if for some reason that was a, that was shown in error and there was some fruit of that piece of paper that somehow tainted and all of that was away? Not the videos, but just the piece of paper. So, Your Honor, our position is, is clearly that the videos were the fruit of the poisonous tree, but setting that aside, the treatment records themselves, while they weren't put into evidence at trial, what was put into evidence was the testimony of Director Wanda Lane, whose testimony was based on authenticating the, the videos was based on the written treatment records themselves. It was based on the video. In other words, all the videos came in and all she did was authenticate the videos. I just, I'm having trouble seeing what, what a trial was tainted by just the piece of paper. I know you're not agreeing that the videos shouldn't have come in too, but, but saying I don't agree with you in the videos, I do agree with you on the sheet of paper. How did that taint what happened at trial? Because Your Honor, there's no way to determine who's in the videos, that that man in the green or white jacket is Johnny Flores. He matched the exact clothes and got into the car of the person who identified him as, as that person. I mean, all that came into evidence. So, Your Honor, our position is that that identification was fruit of the poisonous tree. So, so if, if Your Honor is saying, imagine a world in which we don't consider fruit of the poisonous tree at all, and we only consider those treatment records, I would still say that the treatment records are the clear evidence of who, who is in that video. Who's the man in that video? Johnny Flores. The treatment records are the most persuasive, you know, undisputable evidence that that man in that video is Johnny Flores. And that's why the government relied on them. Okay. Very well. Thank you both. Um, case is submitted. We'll move to the second case, which is 23.